UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MARSHA LYNNE COLEMAN-ADEBAYO<br>8815 Earl Court<br>Bethesda, MD 20817<br><br>        Plaintiff,<br><br>   v.<br><br>STEPHEN L. JOHNSON, Administrator,<br>United States Environmental Protection Agency<br><br>        Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

COMPLAINT AND DEMAND FOR JURY TRIAL

INTRODUCTION

1.     This is a civil action alleging retaliation for plaintiff's actions in bringing administrative and judicial proceedings for race, color, sex, and disability discrimination and for other activities seeking to protect her legal rights, and a hostile work environment. Plaintiff seeks injunctive relief, compensatory damages, and attorneys' fees and other costs of the action. Plaintiff requests a trial by jury.

JURISDICTION AND VENUE

2.     Jurisdiction is based on 28 U.S.C. 1331 (federal question jurisdiction), 28 U.S.C. 1343(4) (jurisdiction over suits involving congressional acts protecting civil rights), 42 U.S.C. 2000e-16(c) (jurisdiction over suits involving non-discrimination in federal government employment), Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e-5(f)(3), and the Rehabilitation Act of 1973, 29 U.S.C. 701.

3.     On November 17, 2005, plaintiff filed formal complaint 2006-0019-HQ with the

Office of Civil Rights of the Environmental Protection Agency ("EPA").  On July 10, 2006, EPA

dismissed the complaint on the ground that "an agency shall dismiss an entire complaint that is the

basis of a pending civil action in a United States District Court in which the complainant is a party

provided that at least 180 days have passed since the filing of the administrative complaint."  EPA's

dismissal referred to Civil Action No. 01:04-CV-01399-PLF in the District Court for the District of

Columbia.  In addition, the dismissal stated that plaintiff has the right to file a civil action "within

90 days of receipt of this final agency decision if no appeal has been filed with EEOC."  *See* 42

U.S.C. 2000e-16(c).

4.      On March 30, 2006, plaintiff filed formal complaint 2006-0048-HQ with the Office

of Civil Rights of EPA.  On July 11, 2006, EPA dismissed the complaint on the ground that "[t]o

the extent your client is asserting that these incidents are part of an ongoing claim of harassment *

* *, this complaint must be dismissed * * * because her allegation regarding the denial of her request

to work from home is currently pending before a United States District Court for the District of

Columbia (Case Number 01:04-CV-01399-PLF)."  In addition, the dismissal stated that plaintiff has

the right to file a civil action "within 90 days of receipt of this final agency decision if no appeal to

EEOC has been filed."  *See* 42 U.S.C. 2000e-16(c).

5.      This Court has jurisdiction over these claims because plaintiff has not filed an appeal

with the EEOC and 90 days have not passed since receipt of the final agency decision.  *See* 42 U.S.C.

2000e-16(c).

6.      Venue lies in this Court pursuant to 28 U.S.C. 1391(e) because the events giving rise

to plaintiff's claims occurred in the District of Columbia.

PARTIES

Plaintiff

7.      Marsha Lynne Coleman-Adebayo is a black African-American female citizen of the United States and resident of the State of Maryland.  She is a grade GS-15 employed by EPA.

Defendant

8.      Stephen L. Johnson is the Administrator of EPA.

FACTS

9.       Plaintiff holds a doctorate degree in political science with a specialization in African and international affairs from the Massachusetts Institute of Technology.  She has spent the majority of her professional career working in the areas of environmental protection, international affairs, and sustainable economic development with regard to Africa.

10.      Plaintiff suffers from multiple sclerosis, glaucoma, and optic neuritis, as well as hypertension and depression which are partially controlled by medication.

11.      Plaintiff became employed at EPA in August 1990.

12.      In 1998, plaintiff filed two suits in the District Court for the District of Columbia alleging race, color, sex, and disability discrimination and retaliation in connection with her employment at EPA.  *Coleman-Adebayo v. Browner*, Civil Action No. 98-CV-926-CKK, filed April 14, 1998; *Coleman-Adebayo v. Browner*, Civil Action No. 98-CV-1939-CKK, filed August 5, 1998. The first suit included allegations of failure to provide a fair performance evaluation, denial of awards and a bonus because of plaintiff's race, color, and sex, and subjecting plaintiff to a racially and sexually hostile work environment.  The second suit alleged that plaintiff was retaliated against for her prior complaint of discrimination, that she was discriminated against on the basis of disability

in that she was not provided reasonable accommodation, that the race, sex, and disability discrimination created a hostile work environment, and that she was removed as the South Africa Program Officer and denied a promised Inter-governmental Personnel Act assignment because of race, sex, and disability discrimination.  The cases were consolidated.

13.     On August 18, 2000, the two cases were tried before a jury.  The jury determined that plaintiff suffered race, color, and sex discrimination and awarded plaintiff $600,000 in compensatory damages.  In addition, the jury determined that plaintiff had not faced retaliation after bringing the discrimination claims and that plaintiff had not been subjected to discrimination on account of disability.  The parties then filed pleadings seeking to limit or expand the ultimate relief granted.

14.     Plaintiff has engaged in extensive activities protected by Section 704 of Title VII, 42 U.S.C. 2000e-3(a),  in addition to the two court cases.  Plaintiff was the person most responsible for the initiation of the  Notification of Federal Employees Anti-Discrimination and Retaliation Act of 2002 ("No FEAR Act").  In approximately June 1999, plaintiff co-founded a group called EPA Victims of Racial Discrimination.  This organization was founded to address discrimination and retaliation against whistleblowers at EPA.  Plaintiff developed the organization's agenda, chaired the meetings, and provided the media with information about discrimination.  The group organized two demonstrations that were covered by local and national news media.

15.     On October 3, 2000, plaintiff testified before the House Committee on Science with regard to discrimination at EPA.  Plaintiff's testimony before Congress and her leadership of the EPA Victims of Discrimination contributed to the introduction in Congress, in approximately November 2000, of legislation which ultimately became the No FEAR Act.

16.     EPA Victims of Racial Discrimination became the No FEAR Coalition in

approximately November 2000. As the co-chairman of the No Fear Coalition, plaintiff was deeply involved in obtaining passage of the No FEAR Act in May 2002. The No Fear Coalition continues today.

17.     EPA retaliated against plaintiff, and created a hostile work environment, during the period before trial (involving incidents not in the consolidated cases), while awaiting the Court's rulings on relief, and subsequent to the rulings, because of plaintiff's filing EEO complaints, her winning the consolidated suits, her leadership on behalf of EPA victims of racial discrimination, her meetings with Congressional staff members, her testifying at a Congressional hearing on the employment problems at EPA, and her leadership in the passage of the No FEAR ACT. The retaliation included denying administrative leave for plaintiff to prepare for her trial, placing plaintiff on a 120-day detail in which plaintiff was required to conduct research outside of her area of expertise, extending plaintiff's detail beyond the original period, initiating an ethics investigation concerning plaintiff's participation in the National Summit on Africa, giving plaintiff a letter of reprimand for requesting union representation after being told of a reassignment, and denying plaintiff the ability to work at home despite letters from her cardiologist as to the harm caused by working in EPA offices. These incidents, which took place during the period from 1999 to 2000, are included in plaintiff's claim of a hostile work environment, as alleged in EEO Nos. 2006-0019-HQ and 2006-0048-HQ and are part of a continuing hostile environment which began in 1999 and has continued until the present.

18.     In letters to EPA dated October 30, 2000, November 17, 2000, and December 5, 2000, plaintiff's cardiologist, Dr. Martin S. Kanovsky, explained that plaintiff had elevated blood pressure, that past attempts to control plaintiff's blood pressure with medication had been

unsuccessful, and that sustained elevations in blood pressure could increase the risk of stroke, heart attack, and renal failure. As a result, plaintiff filed a motion for a temporary restraining order on December 21, 2000, requesting that the Court order EPA to immediately grant plaintiff permission to work at home pursuant to EPA's Medical Flexiplace program. Before the Court ruled on the motion, EPA agreed to allow plaintiff to work at home.

19. On January 5, 2001, this Court ruled on the relief in the consolidated cases. The Court capped the compensatory damages at $300,000 pursuant to the statutory maximum in 42 U.S.C. 1981a(a)(1), (b)(3), and ordered EPA to promote plaintiff to a GS-15 level retroactive to September 1995, provide plaintiff with full back pay and benefits in accordance with the retroactive promotion, and ensure that plaintiff's current pay and benefits were commensurate with the retroactive promotion.

20. On May 11, 2000, plaintiff applied under the Alternate Work Space Policy ("AWS") to work at home and twice provided medical documentation to support her application. AWS allows EPA employees to work outside their normal offices, either in special EPA offices or at home, for medical reasons, even though the employee is not recognized by EPA as disabled. Plaintiff's application was denied.

21. The Final American Federation of Government Employees National Collective Bargaining Agreement for Flexiplace defines three types of "Flexiplace" programs which allow employees to work at alternate work stations other than an employee's "official" work station. Even though plaintiff applied for AWS, not Flexiplace, EPA notified plaintiff that she could work at home under "regular" Flexiplace for a period of 60 days. The memorandum states that the time period for an employee's authorization "may be extended where the eligibility factors and other requirements

of this agreement are met.  Such extensions will not be unreasonably denied."

22.     Plaintiff's direct supervisor was Thomas Murray, Chief, Prevention Analysis Branch, who, in turn, reported to Dr. Allan Abramson, Director of the Pollution Prevention Division.  After being authorized to work at home, plaintiff received direction solely from Dr. Abramson until she was reassigned to a different organization.

23.     EPA refused to extend plaintiff's Flexiplace authorization in the same manner as other employees.  EPA sent plaintiff a letter or e-mail every 30 to 60 days, stating that EPA had decided to extend plaintiff's authorization to work at home for an additional 30 to 60 days.  This procedure caused plaintiff severe stress as the end of each extension got closer, not knowing whether she would receive an extension or whether she would have to fight to be allowed to continue to work at home.  Upon information and belief, other workers who are allowed to work at home are typically given authorization to work at home for periods far longer than 30 to 60 days.

24.     Defendant had been on notice since 2000 that plaintiff's medical health would be seriously harmed if she were required to return to work at EPA offices.  On December 5, 2000, plaintiff's cardiologist, Dr. Kanovsky, stated that plaintiff should be allowed to work at home in order that her blood pressure could be controlled and that "[m]y strong and repeated medical opinion remains the same that Dr. Coleman-Adebayo['s] work-place should be immediately transferred to her home office once I release her from medical care."  Dr. Kanovsky's opinion has not changed. In a letter dated November 19, 2003, Dr. Kanovsky stated:

> I have been treating Mrs. Coleman-Adebayo for hypertension for the last three years. Her hypertension developed while she was employed at the EPA.  She is presently on medication for her hypertension and her blood pressure is well controlled. However, at this point she is working at home.  While she was working at the EPA offices her blood pressure was very difficult to control.  She developed hypertension

7

while working there. Previously we have found that the stress of the working conditions at the EPA have made her blood pressure difficult to control. Her elevated blood pressure initially started at the same time when the stress at her work became intense. Over the last few years I've repeatedly recommended that she not work in the stressful environment at the EPA. We have found that this does elevate her blood pressure significantly. Elevated blood pressure can ultimately lead to renal failure, heart attack or stroke. In view of this I would strongly recommend that she not return to work physically at the EPA.

25.     In a letter dated August 7, 2003 (two days before plaintiff's Flexiplace authorization was to expire), Dr. Abramson stated that he was extending the previous end date of August 9, 2003, for an additional 120 days. That meant that plaintiff was authorized to work at home until at least December 7, 2003.

26.     EPA and plaintiff were involved in mediation discussions on her administrative claims for approximately 32 months. During the mediation, Bridget C. Shea, Senior Policy Advisor in the EPA Office of Administration and Resources Management, stated that EPA's goal in the mediation was to find a way to force plaintiff to resign from EPA.

27.     On October 8, 2003, plaintiff's counsel was told by the mediator that Ms. Shea had notified him that, unless plaintiff made a written demand or counter-offer to EPA's latest settlement proposal, EPA would consider the mediation to be over and EPA would require plaintiff to report to work at an EPA office on November 3, 2003.

28.     In a letter to plaintiff dated November 6, 2003, Ms. Shea stated:

As you are aware, the mediation of your pending Equal Employment Opportunity complaints against the Environmental Protection Agency (EPA) or Agency) which has been ongoing since February, 2001, was completed on November 4, 2003 without a successful resolution.

In light of this fact, you are expected to report to work at the Office of Pollution Prevention and Toxics on December 1, 2003. Work responsibilities and assignments will be provided to you at that time. During the interim period, you will

continue in your temporary flexiplace arrangement until November 29, 2003 at which time this arrangement will expire.

29.    Ms. Shea's order for plaintiff to report for work at the Office of Pollution Prevention and Toxics on December 1, 2003, was in conflict with Dr. Abramson's extension of plaintiff's authorization to work at home until December 7, 2003. Ms. Shea's order constituted retaliation and harassment against plaintiff because of plaintiff's pursuit of administrative and legal remedies regarding EPA's employment discrimination and plaintiff's refusal to accept EPA's mediation offer.

30.    Ms. Shea's order was issued without the knowledge of plaintiff's supervisor. Dr. Abramson stated, in an e-mail dated November 12, 2003, that he had been unaware of plaintiff being ordered to return to work on December 1, 2003. There could not have been any business reason for the December 1 date if plaintiff's immediate supervisor was unaware of it.

31.    Ms. Shea's order for plaintiff to report to work on December 1, 2003, was in direct violation of the procedures of the Flexiplace program. The Final American Federation of Government Employees National Collective Bargaining Agreement for Flexiplace of November 25, 1998, states:

> The Agency may remove an employee from the Flexiplace Program based on the employee's failure to adhere to the requirements specified in the Flexiplace Program Agreement and/or performance or conduct issues or concerns which adversely affect or alter the conditions pertaining to any of the approval criteria in Section VI. When a decision is made to remove an employee from the Flexiplace Program, the employee must be given written notice indicating the reason(s) for removal * * *.

Ms. Shea's order gave no reason pursuant to the collective bargaining agreement why the Flexiplace arrangement was being terminated. EPA has never contended that plaintiff has failed to adhere to any requirements of the Flexiplace Program or that there are any performance or conduct issues or concerns adversely affecting or altering the conditions relating to the approval criteria in Section VI

of the Agreement.

32.     Ms. Shea's order stated that plaintiff was being ordered to report to work at EPA offices because the mediation "was completed on November 4, 2003, without a successful resolution." There is no reasonable relationship between the end of mediation and the termination of plaintiff's authorization to work at home. Mediation is a voluntary process whose termination should have no negative consequences. Plaintiff is unaware of any document that was issued when she was first authorized to work at home that linked the authorization to work at home to the mediation process.

33.     No business reason had been identified by EPA for requiring plaintiff to stop working at home and return to an EPA headquarters office.

34.     From 2000 until December 22, 2003, EPA never requested that plaintiff provide medical documentation as to why she must continue to work from home.

35.     Prior to Ms. Shea's November 6, 2003, letter, EPA did not provide plaintiff with an opportunity to provide the reasons why it is essential, in order to prevent serious injury to plaintiff's health, that she be allowed to continue to work at home.

36.     On November 18, 2003, plaintiff's counsel notified Ms. Shea that plaintiff intended to bring suit to prevent EPA from forcing her to return to work in an EPA building despite her medical problems. On November 21, Mr. Murray sent plaintiff a letter reassigning her to a position in the Office of Cooperative Management ("OCEM") in EPA headquarters and reiterating that she must report for work on December 1, 2003. Mr. Murray further stated that "[s]hould you not be able to report to work on December 1, 2003, for a medical or other appropriate reason, you must contact Daiva Balkus, Director, OCEM prior to your reporting date to address this matter."

37.     On November 24 and November 25, 2003, Daiva Balkus, Director, Office of Cooperative Environmental Management, listed as the person requesting the action, and Ray Spears, Deputy Chief of Staff, listed as the person authorizing the action, signed a Request for Personnel Action (SF 52), which stated that plaintiff was being reassigned to a new position in the Office of the Administrator, OCEM, Committee Policy & Oversight Staff.  The document stated that her position title was being changed from "Environmental Protection Specialist" to "Senior Program Analyst."  In addition, the box for "Bargaining Unit Status" was left blank, indicating that plaintiff no longer would be a member of EPA's union.  The "proposed effective date" of the reassignment was listed as December 1, 2003.  EPA did not provide the document to plaintiff until December 7, 2003, after plaintiff had requested it in a letter to Ms. Balkus on December 1, 2003.

38.     On December 9, 2003, after plaintiff asked Ms. Balkus to clarify plaintiff's union status, Ms. Balkus wrote in an e-mail that "your position has been classified as "B" -- meaning that it is exempt from the bargaining unit.  Thus, EPA unilaterally removed plaintiff from union membership.

39.     The reassignment to OCEM was unlawful.  Plaintiff was a member of a union, the American Federation of Government Employees ("AFGE").  EPA is required to consult with AFGE before reassigning any employee to a different position.  Upon information and belief, EPA never consulted with AFGE.

40.     During the two weeks after December 9, 2003, plaintiff received a copy of the SF 50-B "Notification of Personnel Action" that provided the official information concerning the reassignment.  The "Nature of Action" was specified as "Reassignment," the "Legal Authority" was specified as "Reg 335.102," the name of the organization to which plaintiff had been reassigned was

specified as "EPA, Administrator, Office of Cooperative Environmental Management, Environmental Information, Economics and Technology Staff," and the code for "Bargaining Unit Status" meant that plaintiff was no longer in a bargaining unit. In addition, it specified that the name of plaintiff's position before the reassignment was "Environmental Protection Specialist" and that her new position after the reassignment was "Program Analyst."

41.    Plaintiff received a Position Description relating to her new assignment in a letter from William R. Haig, dated December 22, 2003. The Position Description stated that "[t]he work is done in an office setting."

42.    After being reassigned on December 1, 2003, Ms. Balkus sent to plaintiff administrative materials and general information on performance measurement and asked plaintiff to provide thoughts on how she would approach the materials she was given to read. Plaintiff attended training in June 2004. Ms. Balkus did not begin to assign plaintiff any substantive assignments until July 2004, when plaintiff and Ms. Balkus agreed to a work plan for at least the next year. Plaintiff's assignment was to work with a Designated Federal Officer and stakeholders to develop a pilot project that would prepare performance standards and measurements to assess the success of Federal Advisory Committee Act committees. Plaintiff was able to perform the assignment from home because it consisted of research, telephone communications, analysis, and writing.

43.    On December 9, 2003, plaintiff again requested a determination from EPA that she be allowed to work at home as a reasonable accommodation for her medical conditions. On March 22, 2004, Mr. Haig responded that "this employee is determined not to be an individual with a disability."

12

44.    On April 20-22, 2004, plaintiff's supervisor held a three-day team-building meeting in Cambridge, Maryland.  After her request for an accommodation to attend the event by telephone was denied, plaintiff traveled to the meeting.  Plaintiff experienced symptoms of her medical problems on the way to and at the meeting.  On the afternoon of the second day of the meeting, she felt so ill that hotel staff called for transportation to take her to the emergency room of a local hospital.  Her blood pressure was 156/103.  After being released from the hospital that evening, she took a bus back to her home the next morning and was not able to attend the last day of the meeting.

45.    The incidents described above in paragraphs 18-44, which took place during the period from 2000 to 2004, are included in plaintiff's claim of a hostile work environment, as alleged in EEO Nos. 2006-0019-HQ and 2006-0048-HQ and are part of a continuing hostile environment which began in 1999 and has continued until the present.

46.    Plaintiff's neurologist has described the effects that multiple sclerosis and optic neuritis have on plaintiff, both at home and at work:

> Ms. Coleman-Adebayo has optic neuritis, which causes problems with her left eye, including problems with her peripheral vision, depth perception, color distinctions, and sometimes extreme pain.
>
> *                    *                    *
>
> Ms. Coleman-Adebayo's condition is greatly worsened when she is subjected to stress. * * * [F]orcing her to return to an EPA office would have serious effects on her health. * * * It is my strong medical opinion that Ms. Coleman-Adebayo be allowed to work at home for medical reasons.
>
> *                    *                    *
>
> Ms. Coleman-Adebayo suffers from MS which seriously affects numerous elements of her life.  MS is an incurable degenerative disease that has unpredictable progression and may be life threatening.  The disease has adversely impacted Ms. Coleman-Adebayo's vision, use of her limbs, balance, physical strength, endurance,

13

stress tolerance and muscle flexibility, thus substantially limiting her major life activities of seeing and walking. It is a constant struggle for her to perform her daily life and work activities. Requiring her to work in a highly stressful workplace, rather than at home, would increase the impact of MS to such a degree that it would be very difficult, if not impossible, for her to function as she is currently able to do from her home for the EPA. In addition, the stress would make her MS more active and result in a faster progression of the disease. Her symptoms from optic neuritis would increase. I do not see any alternative for Ms. Coleman-Adebayo other than to avoid stressful situations such as a stressful workplace. My strong medical recommendation is that Ms. Coleman-Adebayo be given the permanent accommodation of working from her home.

47. Plaintiffs' ophthalmologist, Dr. Deborah Y. Wilson, has described the effects of glaucoma, optic neuritis, and multiple sclerosis on plaintiff's vision:

Ms. Coleman-Adebayo's vision, as confirmed by recent examination, is affected by glaucoma, optic neuritis and multiple sclerosis. The danger of glaucoma is what happens when the glaucoma worsens and vision is progressively reduced. If the glaucoma is not controlled, blindness will result.

\* \* \*

If Ms. Coleman-Adebayo is subjected to additional stress by being forced to work in EPA offices, Ms. Coleman-Adebayo's glaucoma and optic neuritis are likely to worsen. If she is subjected to additional stress in the workplace, her vision is likely to be seriously affected. As I stated, she could become blind. Even if she does not become blind, her quality of life would likely depreciate. If this occurs, especially at her age, this will impact every aspect of her professional and personal life. Considering the impact of stress on glaucoma, optic neuritis, multiple sclerosis and hypertension, this is an unacceptable medical risk.

\* \* \*

I do not see any alternative for Ms. Coleman-Adebayo other than to avoid stressful situations such as a stressful workplace. Given the seriousness of Ms. Coleman-Adebayo's medical history and the present and future medical challenges, my strong medical recommendation is that Ms. Coleman-Adebayo be given the permanent accommodation of working from her home office.

48. Plaintiff has repeatedly provided EPA with documentation from her doctors to support her requests under the Rehabilitation Act. Nevertheless, on August 29, 2005, after plaintiff

14

had requested that EPA reconsider the denial of her requests for reasonable accommodation under the Rehabilitation Act, EPA requested that plaintiff undergo an Independent Medical Evaluation ("IME"), which plaintiff did.  The doctor performed a perfunctory examination which did not provide EPA with adequate information for an informed decision.  The doctor asked only a very few questions and ordered no tests.

49.     On September 14, 2005, Mr. Haig confirmed his earlier determination that plaintiff was not disabled.  The reasons Mr. Haig gave for the denial show that he failed to address properly the information from the physician who performed the IME and that he improperly considered and analyzed information from other physicians he consulted.

50.     On October 26, 2005, plaintiff's supervisor, Rafael DeLeon, as the "Decision-Maker," reiterated the determination by Mr. Haig that plaintiff was not disabled.  Mr. DeLeon stated that "I am denying your request based on [Mr. Haig's] determination."  Mr. DeLeon did not question the deficiencies in Mr. Haig's letter.

51.     Plaintiff learned later, when reviewing the Record of Investigation for EEO No. 2006-0019-HQ, that the IME physician had stated in his report that plaintiff "suffers with severe depression."  Even though plaintiff had been seeing a psychiatrist for depression since 2004, she had not known at that time that her depression was considered "severe."  Plaintiff was not notified by EPA of this finding.

52.     The incidents described above in paragraphs 48-51, which took place during the period from 2005 to 2006, are included in plaintiff's claim of a hostile work environment, as alleged in EEO No. 2006-0019-HQ and are part of a continuing hostile environment which began in 1999 and has continued until the present.

53.    Defendant continued to allow plaintiff to work from her home until November 2005. On November 30, 2005, defendant ordered plaintiff to report to work at EPA offices.

54.    On December 12, 2005, plaintiff protested to her supervisor, Mr. DeLeon, who had issued the order, that there was no reason to make that decision and requested that Mr. DeLeon consider additional information from her doctors concerning her health. Plaintiff stated that there would be no harm to defendant to consider that information while there would be serious harm to her health from ordering her to work at EPA offices. Defendant would not rescind the order.

55.    On December 28, 2005, plaintiff went to see her cardiologist, Dr. Kanovsky. Her blood pressure was 124/82. Dr. Kanovsky stated that plaintiff's blood pressure should be watched closely after she went to work at the EPA office.

56.    Plaintiff reported to the EPA office on December 29, 2005, at approximately 8:30 a.m. At around 12:00 p.m., she became ill. She began to experience light headedness, blurred vision, nausea, and an increased heart beat. She sought medical assistance and spoke with her team leader. The only assistance she received was the telephone number of the health unit, which was in another building several blocks away, and directions on how to get there. It took her approximately 15-20 minutes to walk to the health unit. No one accompanied her.

57.    The health unit report stated that plaintiff reported that she had blurred vision, which was getting worse, and pain in her left eye. Her blood pressure was measured at 140/97. The health unit told plaintiff that it wanted to call an ambulance to take her to the hospital emergency room. Plaintiff asked the health unit to call her office to see if someone could accompany her to the hospital. The health unit called her office and spoke to the acting director of the office, who stated that no one was available. The health unit then called plaintiff's husband to come to pick her up.

Plaintiff and her husband decided that plaintiff should seek emergency attention from her personal physician, Dr. James L. Davis, and they went to his office immediately.

58.     After taking sick leave, plaintiff again reported to work at the EPA office on January 3, 2006, at approximately 8:30 a.m.   Around 9:00 a.m., she again became ill.   She had light headedness, blurred vision, shortness of breath, increased heart rate, faintness, dizziness, sweaty palms, a severe headache, and nausea.   She took her own blood pressure and it was 150/100. Again, she asked for assistance.   No assistance was provided.   Instead of walking, plaintiff took a taxi by herself to the health unit.   The health unit report shows that her blood pressure was taken twice, with the first reading being 154/104 and the second being 158/104. The health unit implemented emergency services, including administering oxygen by mask, determined that plaintiff should go to an emergency room, and had an ambulance take her to the Howard University emergency room.

59.     At the Howard University emergency room, plaintiff's blood pressure was taken at multiple times as 145/95, 147/93, 144/88 and 153/105.   It later went down to a normal level of 122/81 and plaintiff was discharged.   The "discharge diagnosis" was "headache," "dehydration," "stress," and "uncontrolled HTN" (hypertension).

60.     Plaintiff saw Dr. Davis,   who provided plaintiff with a letter stating that she was unable to work.   He stated that plaintiff could return to work on January 16.   On January 12, 2006, Dr. Davis certified plaintiff's application for leave under the Family and Medical Leave Act ("FMLA").   He stated that plaintiff was "incapacitated in workplace due to overwhelming anxiety. However, she can perform functions in future from home office."   He also stated that plaintiff was "unable to perform essential functions in office.   In future [she] will be able to perform from home

office."

61.     During December 2005 and January 2006, plaintiff applied for and was granted leave under the FMLA.  Shortly after starting on leave, Mr. DeLeon notified plaintiff that he had decided to terminate plaintiff's internet service that she had been provided.  Mr. DeLeon then began to communicate with plaintiff on her personal e-mail account.  Mr. DeLeon's e-mail communications questioned the competency of plaintiff's physicians and were abusive.

62.     The incidents described above in paragraphs 53-61, which took place during the period from 2005 to 2006, are included in plaintiff's claim of a hostile work environment, as alleged in EEO No. 2006-0048-HQ and are part of a continuing hostile environment which began in 1999 and has continued until the present.

63.     Plaintiff has suffered severe harm because of EPA's retaliation and harassment that are set forth above.

## CLAIMS

## FIRST CLAIM

### Retaliation

64.      Plaintiff's claim of retaliation is based on retaliatory incidents that took place during 2005-2006, which were alleged in EEO complaints 2006-0019-HQ and 2006-0048-HQ and in paragraphs 48-60 above.

65.     42 U.S.C. 2000e-16 states that "[a]ll personnel actions affecting employees * * * in executive agencies * * * shall be made free from any discrimination based on race, color, religion, sex, or national origin."

66.     42 U.S.C. 2000e-3(a) states that "[i]t shall be an unlawful employment practice for

an employer to discriminate against any of his employees * * * because he has opposed any practice made an unlawful employment practice by this title, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title."

67.     29 C.F.R. 1614.101(b) states that "[n]o person shall be subject to retaliation for opposing any practice made unlawful by title VII of the Civil Rights Act (title VII) (42 U.S.C. 2000e et seq.), * * * or the Rehabilitation Act (29 U.S.C. 791 et seq.) or for participating in any stage of administrative or judicial proceedings under those statutes."

68.     Plaintiff had a good-faith and reasonable belief that defendant engaged in unlawful discrimination practices.

69.     Defendant retaliated against plaintiff because she opposed discrimination made unlawful by Title VII and made charges, testified, assisted, and participated in proceedings under Title VII in violation of Title VII and 26 C.F.R. 1614.101(b).

70.     Defendant's actions caused plaintiff emotional suffering, pain, mental anguish, anxiety, inconvenience, and loss of enjoyment of life.

### SECOND CLAIM

#### Hostile Work Environment

71.     Plaintiff's claim of hostile work environment is based on retaliatory incidents that took place during the period from 2005 to 2006, which were alleged in EPA Case Nos. 2006-0019-HQ and 2006-0048-HQ and described above in paragraphs 48-61 and in the incidents described above in paragraphs 17-44, which took place during the period from 1999 to 2004. These incidents are part of a continuing hostile environment which began in 1999 and has continued until the present.

72.      As set forth above, plaintiff was subjected to a pattern of actions that constituted a

hostile work environment in retaliation for plaintiff's engagement in protected activities. The hostile work environment adversely affected the "terms, conditions, or privileges" of her employment.

73.    Defendant's actions caused plaintiff emotional suffering, pain, mental anguish, anxiety, inconvenience, and loss of enjoyment of life.

RELIEF

Wherefore, plaintiff respectfully requests that the Court:

74.    Enjoin defendant from continuing to retaliate against her because she filed and prosecuted this civil action or other civil actions or administrative claims or because of other activities she has pursued in furtherance of the civil rights of herself or other employees of EPA;

75.    Enjoin defendant from continuing to subject plaintiff to a hostile work environment;

76.    Award compensatory damages, including, but not limited to, medical costs, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, inconvenience, loss of reputation, and other nonpecuniary costs;

77.    Award attorneys' fees and other costs, including expert witness' fees;

78.    Order such other relief as may be deemed equitable and proper.

Respectfully submitted,

BRUCE J. TERRIS (D.C. Bar No. 47126)
MICHAEL G. SHAW (D.C. Bar No. 473008)
Terris, Pravlik & Millian, LLP
1121 12th Street, N.W.
Washington, DC  20005-4632
(202) 682-2100 (tel)
(202) 289-6795 (fax)

Attorneys for Plaintiff

October 6, 2006

20

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Marsha Lynne Coleman-Adebayo | Stephen L. Johnson, Administrator, U.S. Environmental Protection Agency |

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF     88888
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Terris, Pravlik & Millian, LLP
1121 12th Street, N.W.
Washington, DC 20005

ATTORNEYS (IF KNOWN)

---

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff
○ 3 Federal Question (U.S. Government Not a Party)
◉ 2 U.S. Government Defendant
○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

---

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

○ **A. Antitrust**

☐ 410 Antitrust

○ **B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

○ **C. Administrative Agency Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

---

○ **E. General Civil (Other)**    **OR**    ○ **F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ **G.** *Habeas Corpus/* *2255* | ◉ **H.** *Employment Discrimination* | ○ **I.** *FOIA/PRIVACY ACT* | ○ **J.** *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☒ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted<br>Student Loans<br>(excluding veterans) |

| ○ **K.** *Labor/ERISA (non-employment)* | ○ **L.** *Other Civil Rights (non-employment)* | ○ **M.** *Contract* | ○ **N.** *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>    Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>    Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 Americans w/Disabilities-<br>    Employment<br>☐ 446 Americans w/Disabilities-<br>    Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>    Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>    Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting<br>(if Voting Rights Act) |

## V. ORIGIN

◉ 1 Original   ○ 2 Removed   ○ 3 Remanded from   ○ 4 Reinstated   ○ 5 Transferred from   ○ 6 Multi district   ○ 7 Appeal to
Proceeding      from State        Appellate Court       or Reopened       another district        Litigation            District Judge
                       Court                                                                        (specify)                                      from Mag. Judge

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

42. U.S.C. 2000e-3; 42 U.S.C. 2000e-5; 42 U.S.C. 2000e-16: Retaliation and Hostile Work Environment

## VII. REQUESTED IN COMPLAINT
CHECK IF THIS IS A CLASS ☐ ACTION UNDER F.R.C.P. 23     DEMAND $ _____   Check YES only if demanded in complaint
JURY DEMAND:   YES ☒   NO ☐

## VIII. RELATED CASE(S) IF ANY
(See instruction)   YES ☒   NO ☐   If yes, please complete related case form.

DATE  10/6/06   SIGNATURE OF ATTORNEY OF RECORD  *[signature]*

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

**I.**     COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

**III.**    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

**IV.**    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

**VI.**    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

**VIII.**   RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.